UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, et
al.,

        2:05-CV-2257-MCE-KJM

      Plaintiffs,

   v.             <u>MEMORANDUM AND ORDER</u>

BILL LOCKYER, Attorney General
of California, et al.,

      Defendants.

----oo0oo----

Plaintiffs Chamber of Commerce of the United States of America ("Chamber of Commerce") and Xpedite Systems, LLC d/b/a Premiere Global Services ("Xpedite")(collectively, "Plaintiffs") have filed the instant action against Bill Lockyer, Attorney General of the State of California, and Charlene Zettel, Director of the California Department of Consumer Affairs (collectively, "Defendants") seeking a declaration that, insofar as it applies to interstate facsimile advertisements, Section 17538.43 of California's Business and Professions Code ("SB 833") is preempted by federal law and violates the Commerce Clause.

1

In addition, Plaintiffs seek an injunction permanently barring enforcement of SB 833.  For the reasons set forth fully below, the Court grants Plaintiffs' request for declaratory relief hereby concluding that SB 833 is constitutionally infirm to the extent that it seeks to govern the interstate transmission of unsolicited facsimile advertisements.  However, the Court refrains from addressing the issue of permanent injunctive relief until the propriety of such relief can be more fully assessed.

**BACKGROUND**

This case involves the convergence of certain federal and state laws including the Federal Communications Act of 1934 ("FCA"), the Telephone Consumer Protection Act of 1991 ("TCPA"), as amended by the Junk Fax Protection Act of 2005 ("JFPA")(collectively "Federal Laws"), and California's SB 833. The foregoing Federal Laws generally create a statutory framework that governs interstate telecommunications and, particularly at issue here, the transmission of unsolicited facsimile advertisements.  Through SB 833, California's Legislature is seeking to accord the citizens of California with more stringent protections than those afforded under the federal scheme.

The specific divergence between the two schemes that has given rise to this litigation is as follows.  The federal scheme permits a party to transmit unsolicited facsimile advertisements to recipients with whom they have an "established business relationship" provided those advertisements bear an opt-out alternative.

Conversely, California's scheme, as embodied in SB 833, omits the established business relationship exception and, instead, requires a sender to obtain express prior consent before transmitting any facsimile advertisements into or out of California.

In order to properly assess the constitutional concerns raised by SB 833, the Court must first set forth both the federal and state schemes to examine the foundation each legislative body was intending to lay.  Accordingly, what follows is a brief recitation of the present federal and state regulatory schemes.

**A.   The Federal Communications Act of 1934**

The text of the FCA explains that "[t]he provisions of [the FCA] shall apply to all interstate and foreign communication by wire or radio."  47 U.S.C.S. § 152(a).  As a general matter, this provision commits to the FCC the right to govern interstate telecommunications.  Likewise, subject to certain exceptions, the FCA generally commits to the States jurisdiction to regulate intrastate telecommunications.  47 U.S.C.S. § 152(b).

**B.   The Telephone Consumer Protection Act of 1991**

In 1991, Congress enacted the TCPA, Pub. L. No. 102-243, 105 Stat. 2394 (1991).

///

///

///

The TCPA added Section 227 to the FCA making it unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless--(i) the unsolicited advertisement is from a sender with an established business relationship with the recipient."  47 U.S.C.S. § 227(b)(1)(C).  The TCPA defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* at § (a)(5).  Congress also included a savings clause, the language of which is set forth in Section II.B. *infra*.  *See Id.* at § 227(e)(1).

### C.   The 1992 Rules

In 1992, the FCC adopted rules implementing the TCPA.  In explaining the rule implementing the "established business relationship" exception to the TCPA ban on unsolicited facsimile advertisements, the FCC stated that facsimile transmission of advertisements from persons or entities that have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order*, 7 FCC Rcd. 8752 at 8779, ¶ 54 n.87 (1992).  The Commission stated that this "established business relationship" exception was justified because a solicitation to someone with whom a prior business relationship exists does not adversely affect subscriber privacy interests.

4

*Id.* ¶ 34; *see id.* ¶ 54 n.87.  The 1992 rules continued unabated until 2003 when the FCC proposed a revision to its 1992 rules.

### D.  **The 2003 Rules**

In 2003, the FCC announced that it planned to reverse its prior conclusion that an established business relationship provides companies with the necessary express permission to send faxes to their customers.  *Final Rule, Rules and Regulations Implementing the Telephone Consumer Protection Act*, 68 Fed. Reg. 44, 144 (2003).  Under the proposed 2003 rule, a business would be permitted to advertise by fax only with the prior express permission of the fax recipient, which would have to have been in writing and include the recipient's signature and facsimile number, and could not be in the form of an opt-out provision. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order*, 18 FCC Rcd. 14, 014 (2003).

In response to the 2003 proposed rule on this issue, the Senate Committee on Science, Commerce, and Transportation ("Senate Committee") stated that the FCC's proposed rule revisions "effectively eliminate[ed] the [existing business relationship] exception to the general prohibition on unsolicited fax advertisements."  S. Rep. No. 109-76, at 3.  The 2003 FCC rule revisions were repeatedly suspended and, ultimately, were rendered moot by the enactment in 2005 of the JFPA.

///

///

5

### E.   Junk Fax Protection Act of 2005

On July 9, 2005, President George W. Bush signed into law the Junk Fax Prevention Act of 2005 ("JFPA"), Pub. L. No. 109-21, 119 Stat. 359 (2005).  The JFPA amended Section 227 to permit businesses and other entities to send, without the recipient's prior express consent, commercial facsimiles to recipients with whom they enjoy an established business relationship.  47 U.S.C.S. § 227(a)(2).  The Senate Committee's report on the JFPA expressly stated that the purpose of the bill was to "[c]reate a limited statutory exception to the current prohibition against the faxing of unsolicited advertisements to individuals without their prior express invitation or permission by permitting such transmission by senders of commercial faxes to those with whom they have an established business relationship."  S. Rep. No. 109-76, at 1 (internal quotations omitted).

Although the Senate Committee expressed its view that the established business relationship exception was an appropriate exception to the ban on unsolicited facsimile advertisements, the Senate Committee also determined that it was necessary to provide recipients with the ability to stop future unwanted facsimiles sent pursuant to such relationships.  *Id.* at 7.  Consequently, the Senate Committee proposed adding a requirement that every unsolicited facsimile advertisement contain an opt-out notice that gives the recipient the ability to stop future unwanted facsimile solicitations and that senders of such advertisements provide recipients with a cost-free mechanism to stop future unsolicited facsimiles.  *Id.*

According to the Senate Committee, the "established business relationship" exception permits "legitimate businesses to do business with their established customers and other persons with whom they have an established relationship without the burden of collecting prior written permission to send these recipients commercial faxes." *Id.* at 6. The Senate Committee report went on to explain that abandoning the FCC's 1992 rule in favor of its proposed 2003 rules, would have "significant consequences." *Id.* Specifically, the cost and effort of compliance could place significant burdens on some businesses, particularly those small businesses that rely heavily on the efficiency and effectiveness of facsimile machines. *Id.* Noting that businesses had "appropriately relied" on the 1992 rules over the past decade, the Senate report concluded that "[i]f the revised rules go into effect, the previously legitimate practices will be immediately unlawful, and unsuspecting or uninformed businesses may be subject to unforeseen and costly litigation unrelated to legitimate consumer protection aims." *Id.*

**F.  The California Statute**

On October 7, 2005, Governor Arnold Schwarzenegger signed into law SB 833. As noted above, this California legislation provides that:

///
///
///
///

7

> "It is unlawful for a person or entity, if either the person or entity or the recipient is located within California, to use any telephone facsimile machine, computer, or other device to send, or cause another person or entity to use such a device to send, an unsolicited advertisement to a telephone facsimile machine."

Ch. 667, § 1, 2005 Cal. Stat. 93, 94 (2005).

Facsimiles sent without "prior express invitation or permission" are defined as "unsolicited" under Section 17538.43(a)(2). *Id.* The Assembly Committee on Appropriations explained that SB 833 was being enacted, in part, because Congress was considering the JFPA which codified the established business relationship exception and favored an opt-out scheme rather than an opt-in scheme. *See* Cal. Assembly Comm., Analysis of Sen. Bill 833 (2005-2006 Reg. Sess.), at 1 (July 13, 2005); *see also* Sen. Judiciary Comm., Analysis of Sen. Bill 833 (2005-2006 Reg. Sess.), at 1,3 (April 5, 2005). It is unquestioned that California's legislature, in enacting SB 833, was attempting to accord the citizens of the State of California with greater protections than those afforded under the federal scheme.

**STANDARD**

Plaintiffs have styled their motion as one for a temporary restraining order, however, they have requested both declaratory relief as well as a permanent injunction. The Parties and the Court agreed at oral argument that this motion should be treated as one for declaratory relief rather than one for injunctive relief.

8

The operation of the Declaratory Judgment Act is procedural only. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 94 L. Ed. 1194, 70 S. Ct. 876 (1950)(citations and quotations omitted).  Generally, declaratory judgment actions are justiciable if "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 85 L. Ed. 826, 61 S. Ct. 510 (1941).  Declaratory relief is appropriate when, as here, (1) the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.  *Eureka Fed. Sav. & Loan Asso. v. Am. Cas. Co.*, 873 F.2d 229, 231 (9th Cir. 1989)(citations and quotations omitted).

Plaintiffs are also seeking injunctive relief against enforcement of SB 833's prohibition on interstate facsimile advertising.  Plaintiffs originally sought a preliminary injunction, but later sought a temporary restraining order.  In their prayer for relief, Plaintiffs requested permanent injunctive relief.  Defendants approached the present motion as one for preliminary relief as opposed to one for permanent relief.  Because the standards for each are distinct, the Court inquired at oral argument whether Defendants were prepared to proceed on Plaintiffs' request for injunctive relief as a permanent rather than preliminary or temporary remedy.  Defendants indicated that more time would be required to properly respond to Plaintiffs' request for permanent relief.

Accordingly, while the Court is prepared to rule on Plaintiffs' Motion for Declaratory Relief, the Court reserves its judgment regarding the issuance of injunctive relief and will address that matter, if necessary, after a full hearing on the merits.

## ANALYSIS

As noted above, California's SB 833 attempts to heighten the restrictions applied to the transmission of unsolicited facsimile advertisements. Specifically, SB 833 omits the "established business relationship" exception provided under Federal Law and, instead, requires any party seeking to transmit a facsimile advertisement into or out of California to obtain express prior consent from the recipient before doing so. The salient distinction between Federal Law and SB 833 is two-tiered. First, Federal Law expressly permits a party to transmit an unsolicited facsimile advertisement to those with whom an established business relationship exists while SB 833 omits any such exception. Second, Federal Law permits senders to transmit unsolicited advertising facsimiles under the established business relationship exception so long as the advertisement bears an "opt-out" alternative while SB 833 requires senders to obtain an affirmative "opt-in" before engaging in any such transmission.

///
///
///
///
///

## I.    JURISDICTION

As their lead argument, Plaintiffs aver that the State of California has no jurisdiction to regulate interstate commerce as it purports to do through SB 833 because that authority is the exclusive jurisdiction of the FCC.  Plf.s' Mtn. for Temp. Restraining Order P. 12 - 16 ("Plf.s' Memo.").  Conversely, Defendants argue that the FCA reserves to the States the right to regulate certain interstate communications including the transmission of unsolicited facsimile advertisements.  Def.s' Opp. to Mtn. for Temp. Restraining Order P. 15 - 18 ("Def.s' Opp.").

When speaking to the question of whether the FCC has exclusive jurisdiction to regulate interstate telecommunications, the Supreme Court explained that the FCA generally grants to the FCC the authority to regulate "interstate and foreign commerce in wire and radio communication," 47 U.S.C.S. § 151, while expressly denying the FCC "jurisdiction with respect to ... intrastate communication service ...."  47 U.S.C.S. § 152(b). *Public Serv. Com v. FCC*, 476 U.S. 355, 360 (1986)(internal citations omitted). However, the Court went on to clarify that "... while the FCA would seem to divide the world ... neatly into two hemispheres -- one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction -- in practice, the realities of technology and economics belie such a clean parceling of responsibility." *Id.*
///

11

1    Plaintiffs' argument, that States are devoid of authority to
2  regulate interstate telecommunications, is simply too broad.  In
3  fact, as expressly noted above, the Supreme Court recognized that
4  such a clean parceling of responsibility is unworkable.  *Id.*  In
5  addition, there are many examples of Congressional intent to
6  reserve certain rights to the States.  For example, the FCA
7  expressly reserves the right to "impose ... requirements
8  necessary to ... protect the public safety and welfare ... and
9  safeguard the rights of consumers" to States.  47 U.S.C.S. §
10 253(b).  Similarly, the FCA expressly permits States to establish
11 terms and conditions for wireless services, other than those that
12 directly regulate rates or market entry.  47 U.S.C.S. §
13 332(c)(3)(A).

14    As is clear from the foregoing, the FCA contains exceptions
15 to the general proclamation that interstate telecommunications
16 are committed to the FCC's jurisdiction alone.  Accordingly, the
17 Court cannot dispose of the matter before it by summarily
18 concluding that, as a matter of law, the FCC has plenary
19 jurisdiction to regulate interstate telecommunications thereby
20 precluding California from doing so.  Instead, the Court must
21 narrow its focus to whether the language of the Federal Law
22 grants to the States the right to regulate the transmission of
23 unsolicited facsimile advertisements as California purports to do
24 through SB 833.
25 ///
26 ///
27 ///
28 ///

**II. PREEMPTION**

When the Federal Government acts within the authority it possesses under the Constitution, it is empowered to preempt state laws to the extent it is believed that such action is necessary to achieve its purposes. *See New York v. FCC*, 486 U.S. 57, 63-64, 108 S. Ct. 1637, 100 L. Ed. 2d 48 (1988). The Supremacy Clause of the Constitution gives force to federal action of this kind by stating that "the Laws of the United States which shall be made in Pursuance" of the Constitution "shall be the supreme Law of the Land." U.S. Const., Art. VI, cl. 2.

Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *La. Pub. Serv. Comm'n*, 476 U.S. at 369.

Irrespective of the variety of preemption at issue, the Ninth Circuit has clarified that the touchstone issue is not the nature of the state regulation, but the language and congressional intent of the specific federal statute.
///

13

*City of Auburn v. United States*, 154 F.3d 1025, 1031 (9th Cir. 1998)(citing *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 738, 85 L. Ed. 2d 728, 105 S. Ct. 2380 (1985); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95, 77 L. Ed. 2d 490, 103 S. Ct. 2890 (1983) (Preemption of state law is compelled if Congress' command is explicitly stated in the federal statute's language or implicitly contained in its structure or purpose.))

## A.    Presumption Against Preemption

First, because the States are independent sovereigns in our federal system, the federal courts have long presumed that Congress does not cavalierly preempt state-law causes of action. *Bates v. Dow Agrosciences L.L.C.*, 125 S. Ct. 1788, 1801 (2005)(citations and quotations omitted).  While the foregoing presumption against preemption is the starting point in all preemption cases, this presumption is not always applicable. Indeed, when the State regulates in an area where there has been a history of significant federal presence, the presumption usually does not apply.  *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003).  Here, there is no dispute that the area of interstate telecommunications has a history of significant federal presence.  Indeed, since the passing of the FCA in 1934, there has been a tremendous amount of federal legislation regarding interstate telecommunications including legislation directly concerned with the transmission of unsolicited facsimile advertisements.

///

14

Consequently, the Court finds that the presumption against preemption inapplicable to the case at bar.

**B.    Statutory Construction**

As explained above, Section 151 of the FCA, together with the later decisions interpreting the same, generally allocate to the FCC the right to govern interstate telecommunications.  Here, however, Congress included a savings clause that parses the authority to regulate the use of telephone equipment, including facsimile machines, between the States and the FCC. That savings clause provides as follows:

> "STATE LAW NOT PREEMPTED.—Except for [certain specified provisions of the TCPA], nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—(A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements."

*Id.* at § 227(e)(1).

Defendants urge the Court to dissect the forgoing provision into two parts as follows: Nothing in this section shall preempt any state law that [clause 1] imposes more restrictive *intrastate* requirements or regulations on; or [clause 2] which prohibits the use of telephone facsimile machines to send unsolicited advertisements.  Defendants first suggest that the savings clause was included in Section 227 simply to make clear that Federal Law does not preempt more restrictive intrastate requirements or regulations.

///

Defendants go on to argue that Congress' inclusion of the
*intrastate* qualifier in clause 1 and its omission of that same
qualifier in clause 2 should be interpreted to mean that Federal
Law does not preempt more restrictive intrastate requirements nor
does it preempt prohibitions of either intrastate or interstate
telecommunications.

Defendants' proposed interpretation produces an ungainly
construction that the Court does not believe Congress intended.
In addition, Defendants' construction fails to answer the salient
issue in this case.  That is, whether the savings clause acts to
salvage a State's right to pass more restrictive *interstate*
requirements on transmitters of unsolicited facsimile
advertisements.

In construing the language of a statute, the Supreme Court
has clarified that it is the duty of the Court to give effect, if
possible, to every clause and word. *Duncan v. Walker*, 533 U.S.
167, 174 (2001)(citing *United States v. Menasche*, 348 U.S. 528,
538-539, 99 L. Ed. 615, 75 S. Ct. 513 (1955); *see also Williams
v. Taylor*, 529 U.S. 362, 404, 146 L. Ed. 2d 389, 120 S. Ct. 1495
(2000)(describing this rule as a "cardinal principle of statutory
construction").

Under Defendants' rendition, Congress' inclusion of Section
227(e)(1) has no operative effect because it acts solely to
reiterate States' preexisting right to enact more restrictive
intrastate regulations on telecommunications.  Under this theory,
the entire first section of the savings clause could be omitted
without affecting a State's right to enact intrastate regulations
on telecommunications.

16

The Court must be "reluctant to treat statutory terms as surplusage" in any setting. *Babbitt v. Sweet Home Chapter, Communities for Great Ore.*, 515 U.S. 687, 698, 132 L. Ed. 2d 597, 115 S. Ct. 2407 (1995).  In order to give the savings clause an operative meaning, the Court hereby concludes that Section 227(e)(1) salvages, rather than merely reiterates, States' rights to govern intrastate transmissions of unsolicited facsimile advertisements.

In light of the Court's conclusion that Section 227(e)(1) saves States' rights to impose more restrictive *intrastate* regulations from preemption, it turns to the question of whether that Section also acts to salvage regulations that impose restrictions on *interstate* telecommunications as California purports to do through SB 833.  Here, the Court must consider Congress' inclusion of the word "intrastate" in the savings clause.  If the savings clause is construed to preserve the right to restrict both intrastate and interstate telecommunications, then the word "intrastate" places no constraint on the States' jurisdiction over telecommunications and the inclusion of the word "intrastate" would be surplusage.  As noted above, the Court believes that its duty to give each word some operative effect where possible precludes such a construction.

In addition to the foregoing examination of the statutory language, an examination of the legislative history of the federal scheme shows that Congress' purpose in passing the JFPA was to retain the established business relationship exception for the transmission of unsolicited facsimile advertisements.
///

17

1  Specifically, in 2003 when the FCC proposed to abolish the
2  established business relationship exception, Congress responded
3  by enacting the JFPA and codifying that exception.  Further, in
4  the same report that the Senate Committee expressed its view that
5  the established business relationship exception was an
6  appropriate exception to the ban on unsolicited facsimile
7  advertisements, it also determined that an opt out scheme would
8  present an appropriate mechanism to stop unwanted facsimile
9  advertisements.  S. Rep. No. 109-76, at 7.  This countermeasure
10 is evidence that Congress understood the concerns voiced by
11 consumers and elected to create an opt-out scheme to address
12 those concerns.

13      In this instance, SB 833 stands as an obstacle to the
14 accomplishment and execution of the full purposes and objectives
15 of Congress because it eliminates the established business
16 relationship exception that Congress expressly codified in the
17 JFPA and nullifies Congress' decision that unsolicited facsimile
18 advertisements be governed by an "opt-out" rather than an "opt-
19 in" scheme.  *See Hines v. Davidowitz*, 312 U.S. 52, 67, 85 L. Ed.
20 581, 61 S. Ct. 399 (1941); *Geier v. Am. Honda Motor Co.*, 529 U.S.
21 861, 899, 146 L. Ed. 2d 914, 120 S. Ct. 1913 (2000)(quoting
22 *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 131 L. Ed. 2d
23 385, 115 S. Ct. 1483 (1995)).  Consequently, the Court finds
24 that, to the extent California attempts to regulate the
25 *interstate* transmission of unsolicited facsimile advertisements
26 through SB 833, it has exceeded its jurisdiction rendering that
27 portion of the statute violative of the Supremacy Clause and,
28 therefore, constitutionally infirm.

1    In conclusion, the Court wishes to stress that it is mindful
2  of the burden created by unsolicited facsimile advertisements.
3  The Court recognizes that unsolicited advertisements transmitted
4  via facsimile machines cost recipients untold resources in the
5  form of time and money.  Despite these realities, the Court
6  cannot unilaterally raze the legal landscape carefully cultivated
7  by Congress.  In fact, today's decision leaves untouched the
8  protections against unsolicited faxes afforded by Federal Law as
9  well as California's SB 833 to the extent it applies to
10 intrastate telecommunications.  Specifically, unsolicited faxes
11 to individuals from entities with whom they do not enjoy a
12 business relationship are still barred under Federal Law.
13 Similarly, consumers' retain the right to preclude, or opt-out,
14 of unsolicited faxes even when an established business
15 relationship does exist.  Indeed, while SB 833 suffers from
16 constitutional infirmity with respect to its interstate reach,
17 the protections afforded California consumers for intrastate
18 facsimile transmissions remain inviolate.

19

20                              **CONCLUSION**

21

22    The Court finds that a judgment in favor of Plaintiffs will
23 serve a useful purpose in clarifying and settling the
24 constitutional issues raised by SB 833 and will terminate and
25 afford relief from the uncertainty, insecurity, and controversy
26 giving rise to this action.  The Court concludes that SB 833 is
27 unconstitutional to the extent it attempts to govern interstate
28 transmission of unsolicited facsimile advertisements.

Accordingly, declaratory judgment is appropriate and final judgement in favor of Plaintiffs is therefore entered.  However, the Court reserves judgment regarding injunctive relief until the Parties have a full and fair opportunity to be heard on the merits of their respective claims.


    IT IS SO ORDERED.


DATED: February 27, 2006


_____
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE

20